The **PHILADELPHIA HOUSING AUTHORITY, on behalf of itself and all others similarly situated**

v.

**AMERICAN RADIATOR & STANDARD SANITARY CORPORATION et al.**

**LINDY BROS. BUILDERS, INC. OF PHILADELPHIA et al.**

v.

**AMERICAN RADIATOR & STANDARD SANITARY CORPORATION et al.**

**Civ. A. Nos. 41773, 41774.**

United States District Court
E. D. Pennsylvania.
July 29, 1968.

See also D.C., 269 F.Supp. 540; 291 F.Supp. 252.

Aaron M. Fine, and Dolores Korman, Philadelphia, Pa., for Philadelphia Housing Authority and other named plaintiffs.

William E. Willis, New York City, Patrick T. Ryan, Philadelphia, Pa., for American Radiator & Standard Sanitary Corp.

## OPINION

JOHN W. LORD, Jr., District Judge.

Plaintiffs have filed a Motion For Production, pursuant to Fed.R.Civ.P. 34, for the production of twenty-five (25) reels of magnetic tape recordings of conversations between William E. Kramer of the Plumbing Fixture Manufacturers Association (hereafter "PFMA") and various members and associates of that organization. The tapes allegedly contain much relevant information relating to the price fixing conspiracy which is the subject of this present suit.

The motion to suppress the tapes in the related criminal action was denied by Judge Rosenberg sitting in Pittsburgh. United States v. American Radiator & Standard Sanitary Corp., 278

F.Supp. 241 (W.D.Pa.1967). The tapes were delivered on June 26, 1968 by counsel for the government in the criminal case to Clayton A. Sweeney, Esquire acting on behalf of all defendants in the criminal action. Apparently the tapes are recordings of telephone conversations between William Kramer, the former secretary of the PFMA and various members of the organization. Defendants have explained that Kramer had embezzled large sums of money from the PFMA and used the compromising statements made during the recorded telephone conversations to block any disclosure by the PFMA of the embezzlement. Kramer threatened to turn the tapes over to the Attorney General and when the defendant members did not acquiesce in his embezzlement the tapes eventually made their way into the hands of the federal authorities. The PFMA membership refused to accede to Kramer's blackmail threat and, much to their credit, notified the F.B.I. Kramer was ultimately convicted for interstate transportation of stolen money on his plea of *nolo contendere.*

The tapes were presented before the Grand Jury in the Western District of Pennsylvania, which, on October 6, 1966, handed down indictments against defendants herein and certain individuals.

During the course of an informal conference between the government's counsel and counsel for the defendants, before June 13, 1968, defense counsel expressed concern over taking physical possession of the tapes as such possession might enable the tapes to be discovered in this proceeding. Ultimately, the defendants accepted possession of copies of the twenty-five tapes, through Mr. Sweeney on June 26, 1968. Upon learning that the Omnibus Crime Control and Safe Streets Act of 1968 had become effective on June 19, 1968 (Public Law 90–351, 82 Stat. 197 (June 19, 1968)), Mr. Sweeney refused to permit any defendant to use or hear the copies of tapes in his possession. Since receiving the tapes they have been in Mr. Sweeney's exclusive possession and have not

been opened or used by anyone but are being retained by him in his safe in his Pittsburgh office.

Defendants have advanced five contentions to bar production of the tapes:

(1) Disclosure of the tapes or their contents is barred by the 1968 Omnibus Crime Act;

(2) The tapes are attorneys' work product, and neither sufficient good cause nor exceptional circumstances warranting their production has been shown;

(3) Portions of the tapes contain privileged communications between attorney and client;

(4) Production of the tapes would violate this Court's protective order of April 25, 1968; and

(5) Production of the tapes would interfere with the preparation and defense of criminal charges concurrently pending in the Pittsburgh federal court against the defendants herein and certain individual defendants.

Each merits separate discussion.

*Omnibus Crime Control and Safe Streets Act of 1968*

■ Defendants have strenuously contended that the new Omnibus Crime Act applies to the tape recordings Kramer made prior to his leaving the PFMA on August 5, 1963. Indeed, William E. Willis, Esquire, who argued defendants' brief on this issue, wrote to the Court on July 17, 1968 and stated that counsel were unable to adequately prepare their affidavits in support of their lawyer-client privilege contention, as they felt that their listening to the tapes would subject counsel to indictment under the Omnibus Crime Act. The fears of defense counsel are unfounded, for not only is it perfectly plain, from the language of the act, that the act speaks only prospectively, but defense counsel will be completely insulated from any prosecution if their review and production of the tapes is made pursuant to order of this Court as the *mens*

*rea* required for a "willful" violation of the statute is absent.

Section 2515 of the new Omnibus Crime Act provides, in relevant part:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, * * * if the *disclosure* of that information would be in violation of this chapter. [emphasis supplied]

The only provision setting forth what "disclosure" is a violation of the Act is Section 2511, which makes guilty of a crime:

> * * * any person who—* * * (c) *willfully discloses*, or endeavors to disclose, to any other person the contents of any wire or oral communication, *knowing or having reason to know that the information was obtained* through the interception of a wire or oral communication *in violation of this subsection*; * * *. [emphasis supplied]

Kramer, in 1962 and 1963, when he made the tapes, or in 1964 or 1965, when they came into the hands of the government, could not be charged with a violation of a law not yet enacted, could not "know" he was violating a law not yet enacted, and could not disclose anything with knowledge of any such violation. Since the evidence exclusion is expressly tied to a disclosure in violation of the act, it can have no application to the situation here.

■ Finally, defense counsel cannot be held to violate the act if they review the tapes and produce them pursuant to an order of this Court. A person violates the act when he "willfully" discloses information proscribed by the act. An act is done "willfully" when it is done with a purpose of violating the law, not when an act is done in good faith compliance with an order of Court. See,

United States v. Rabb, 394 F.2d 230 (3rd Cir. 1968).

### Work Product

■ Defendants argue that the tape recordings sought in plaintiffs' motion for production are not the original Kramer tapes which are still in the Government's possession, but are merely copies prepared by the Government for the use of defense counsel in preparing their defense. Defendants contend that "[c]learly, copies of material obtained by defendants' attorneys as part of the preparation of their clients' defense constitute work product and are not producible unless exceptional circumstances prevail. * * * Surely, the law cannot place a criminal defendant in a position where he can prepare his criminal defense only at the risk of subjecting to civil discovery material discovered from the Government which would not otherwise be within his control." (Defendants' Brief at 11–12). The argument is without merit. As clearly outlined by my colleague, Judge Kirkpatrick, in a lucid opinion collecting relevant authorities, the "work product" ban on production is limited to "matters obtained or produced by the lawyer through work which involves his professional skill and experience." E. I. Du Pont De Nemours & Co. v. Phillips Petroleum Co., 24 F.R. D. 416, 420 (E.D.Pa.1959).* It is extremely doubtful that the government would turn over the tapes to plaintiffs. The copies of the tapes held by defense counsel are not statements obtained by counsel or by an agent of counsel, but were obtained by Kramer. They were not recorded as "the results of the lawyer's use of his tongue, his pen, and his head, for his client." Hickman v. Taylor, 153 F.2d 212, 223 (3rd Cir. 1945), aff'd 329 U.S. 495, 67 S.Ct. 385, 91 L. Ed. 451 (1947). Defense counsel possess the only available copies of the Kramer tapes and cannot bar plaintiffs' access to this evidence by contending that as counsel obtained the evidence to pre-

---

* See also, Banana Distributors, Inc. v. United Fruit Co., 22 Fed.Rules Serv. 34.411 (Case 4) (S.D.N.Y.1956).

pare the criminal case, it is "work product". Undoubtedly, if defense counsel had directed the recordings to be made incident to the preparation of a specific suit, a different result might obtain. Under the present circumstances, the obtaining of the tapes is no different than the obtaining of any other item of non-privileged evidence and production is proper as there is no other source to which plaintiffs can turn for the tapes.

### Lawyer-Client Privilege

██ Defendants point out that prior to receiving possession of the copies of the tapes, some of the defense counsel listened to portions of the recordings at the Justice Department at the invitation of the government. Defendants argue that "[a]mong the tape recordings involved on this motion are recordings of telephone conversations between Kramer, as Secretary of the [PFMA] Association and James C. McKay, attorney for the Association membership. Defendants Wallace-Murray and Universal Rundle specifically refused to waive their attorney-client privilege." Judge Rosenberg has indicated that the principles of attorney-client privilege might be applicable, but that in the criminal proceedings in Pittsburgh no evidence was presented to support the assertion of the privilege. United States v. American Radiator & Standard Sanitary Corp., 278 F.Supp. 608 (W.D.Pa.1967).

To date, no evidence has been produced in this proceeding to support the claim of privilege, although Mr. Willis' letter of July 17, 1968 does offer an explanation as to why no affidavits were filed. This court will order the production of all the tapes and portions of tapes not related to attorney-client privilege. Defense counsel are to review the tapes and transcribe those portions they feel are within the ambit of the attorney-client privilege. They are to submit these transcribed excerpts to the court, *in camera* if they desire, together with any affidavits they wish to supply in support of their contention of privilege. The balance of the tapes are to be turned over to plaintiffs for copying immediately.

### April 25, 1968 Protective Order

██ It would be with extreme reluctance that this court would even entertain a motion for production that would contravene the Order of April 25, 1968 wherein this court approved counsels' agreed upon schedule of discovery. By this agreement, counsel saved the court innumerable hours of reviewing hundreds of objections to interrogatories, etc. However, the protective order, based upon plaintiffs' original Motion for Production, filed on February 7, 1967, called for documents then in defendants' possession and control. It could not have applied to documents defendants did not have. The order on its face purports to deal with plaintiffs' original motion only and does not bar the present request for production of the tapes.

### Interference With Preparation of Criminal Defenses

██ Defendants have failed to demonstrate how the physical reproduction of the tapes at plaintiffs' expense will jeopardize the adequate preparation of the defense of the criminal action that will begin trial in Pittsburgh on November 18, 1968. The copying of the tapes will not be a time consuming matter, nor will the review of their contents by the numerous lawyers at defendants' disposal. Furthermore, there are no grounds for concern that plaintiffs will divulge the contents of the tapes to the government as the original tapes are now in the hands of the Justice Department who turned over the copies of the tapes to defense counsel.

### ORDER

And now, to wit, this 29th day of July, 1968 A.D., it is ordered that Plaintiffs' Motion For Production Of Certain Tape Recordings be and the same is hereby granted, with the following limitation: defendants are to review the copies of the tapes in their possession, edit those portions relating to the nar-

252

row issue of attorney-client privilege and transcribe those portions, turning over the balance of the reels and unedited portions of the reels to plaintiffs immediately. It is further ordered that the edited transcripts are to be delivered to this court, within fifteen (15) days from the date of entry of this order, *in camera* if defendants desire, together with any affidavits and supporting briefs defendants wish to submit relating to the attorney-client issue.

And it is so ordered.